IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MICHAEL HOWELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 14-CV-608-CVE-PJC |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

Claimant, Michael Howell ("Howell"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner" and the "SSA") denying Howell's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  Howell appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that he was not disabled.  This case has been referred to the undersigned. For the reasons discussed below, the undersigned recommends that the Commissioner's decision be **REVERSED AND REMANDED**.

**Claimant's Background**

At the time of the hearing before the ALJ on March 4, 2013, Howell was 48 years old. (R. 73).  He had completed eighth grade. *Id.*

Howell said that he could not work because his knees would not allow him to sit or stand for long periods of time.  (R. 75).  He estimated that he could sit for 20 or 25 minutes at a time,

although that would not be comfortable. *Id.* At the hearing, Howell sat leaning to his left, and he testified that his posture was due to the severity of psoriasis on his back. *Id.*

Howell said that he had recently obtained an MRI of his right knee, and his physicians wanted to address his knee before completing MRI imaging on other joints in his body. (R. 75, 78). Howell said that he had been receiving injections that would help for about 24 hours. (R. 75). The knee would grind and pop, and it would be extremely painful. *Id.* He said that his physicians were considering a knee replacement surgery. (R. 84). His left knee had problems, but he could stand on it longer than he could stand on his right knee. (R. 78).

Howell said that he could stand for about 15 or 20 minutes at a time, and then he would need to move around or sit down. (R. 75-76). He could walk for about five minutes before needing to stop and catch his breath. (R. 76). He had a cane that he had left in his truck for the hearing. *Id.* He used it three or four days a week, primarily in the afternoon. *Id.* Howell testified that he got the cane because of problems falling down, and he still had trouble when his knee would "lock up." (R. 77). Howell said that he sometimes experienced significant swelling in his knee, especially if he walked a lot. *Id.*

Howell said that his most comfortable position was sitting in a recliner with his feet up, and he estimated that he spent about 50 percent of his day in that position. *Id.* He said that the reclining position took the stress off of his back and his knees. *Id.*

Howell testified that his back pain was in his low back, sometimes going into his hips. (R. 77-78). He described the pain as a twisting pain, and he said that lying down would loosen it up somewhat. *Id.*

Howell said that his shoulders, elbows, ankles, and wrists were affected by arthritis. (R. 78). Howell said that he could wash his hair by keeping his elbows close to his body, but he

could not raise his arms above his head or fully extend his arms with his elbows straight. (R. 78-79). He had received injections in his right shoulder that did not seem to help, and his physicians told him that the problem was arthritis. (R. 79).

Howell said that, to deal with his pain, he took ibuprofen in addition to his prescription pain pills and muscle relaxers. *Id.* He said that he could pick something up off of the floor as long as he could hold onto something and then help himself up. *Id.* He estimated that he could lift a maximum of about 20 or 25 pounds. (R. 79-80).

Howell testified that he had trouble sleeping due to the discomfort caused by his psoriasis. (R. 80). He estimated that he slept about five hours with intermittent waking episodes. (R. 81). Howell said that psoriasis would wake him up about three times in a typical night. *Id.* He would feel tired when he woke up in the morning, and he would nap about three or four hours during the day. (R. 81-82).

Howell testified that his psoriasis was a visible rash over his entire body, and he said that it was very itchy. (R. 80). He used steroid creams and other medications prescribed by his physicians, but his psoriasis remained bad. *Id.*

Howell said that he could do a chore such as raking leaves for about 10 minutes before he would feel winded. (R. 82). He thought the winded feeling was probably from smoking. *Id.* Hot weather made his shortness of breath and fatigue worse. *Id.* He had chest pains about twice a week, and he would sit and rest until the pain would ease. (R. 82-83).

Howell said that it would take him almost all day to complete a load of laundry, due to the effort of standing and bending. (R. 83).

Howell said that he had a driver's license, but he did not drive the one hour to the hearing because it was too far for him to drive. (R. 83). His knee and his back would become

uncomfortable sitting in the car, especially when driving, and he could adjust his position more easily in the passenger seat.  (R. 83-84).

Howell was seen at the Miami Health Center on March 9, 2009, and assessments included hypertension and tobacco abuse.  (R. 295).  X-rays of Howell's chest taken that day showed no acute cardiopulmonary process.  (R. 300).  Howell was seen again on November 30, 2009 for a six-month checkup of his hypertension and hyperlipidemia.  (R. 289).  Assessments were hypertension, chronic obstructive pulmonary disease ("COPD"), psoriasis, and tobacco abuse, and Howell was prescribed several medications.  *Id.*  At a follow-up appointment on December 28, 2009, Howell said that he had difficulty breathing in cold weather.  (R. 288).  Assessments included hypertension, COPD, and psoriasis, and he was prescribed medications for those conditions.  *Id.*

X-rays of Howell's right knee completed on August 16, 2010 showed no acute disease. (R. 299).

Howell was admitted to Integris Grove General Hospital on October 17, 2010 after presenting to the emergency room with chest pains.  (R. 216-59).  While in the hospital, chest x-rays showed a suspicious mass in Howell's right upper lung lobe.  (R. 216).  Howell's pain improved with nitroglycerin and a "GI cocktail," and he was discharged October 18, 2010.  *Id.*

Howell followed up with his primary care provider, James H. Tiemann, M.D., at the Miami Health Center on October 20, 2010.  (R. 268-70).  Assessments included a lung nodule, benign essential hypertension, and hyperlipidemia, and a pulmonology referral was made.  (R. 269-70).

Howell saw Dr. Tiemann on December 1, 2010, and he said that his prescription pain medication was not working well for joint pain and that he was taking 1600 mg of ibuprofen on a

4

regular basis. (R. 342-43). Assessments included osteoarthrosis of the shoulder, psoriasis, COPD, hyperlipidemia, and pulmonary nodule. (R. 343). Tramadol was prescribed for Howell's joint pain. *Id.*

Howell saw Dr. Tiemann on March 18, 2011 and complained of right shoulder and back pain. (R. 327-28). Howell complained of swelling of his right knee in addition to pain. *Id.* On examination, Howell had limited abduction of both shoulders and right knee effusion. (R. 328). An x-ray of Howell's right knee completed that day showed mild osteoarthritic changes, and X-rays of his shoulders were unremarkable. (R. 296-97, 456-58).

Howell was seen by a certified physician's assistant on referral from Dr. Tiemann at the Miami Health Center on April 27, 2011 for bilateral shoulder pain, right knee pain, and back pain. (R. 320-22). Howell's right shoulder was given a steroid injection. (R. 321). At a June 17, 2011, office visit for follow-up of his right knee pain, Howell reported that the knee was not causing pain on that date and that his shoulder was doing well following an injection at his last office visit. (R. 314). On examination, joint effusion and medial joint line tenderness were noted. *Id.* Howell was instructed to increase moderate exercise, to use moist heat or ice therapy as needed, and to avoid strenuous activity or heavy lifting. *Id.*

Howell was seen by Dr. Tiemann on August 29, 2011. (R. 382-84). A noted stated that Howell had gained 18 pounds since May and was "adamant that there [was] no physical activity" that he could do. (R. 383). On examination, multiple psoriatic patches were noted. (R. 382-83). Assessments included hypertension, osteoarthrosis involving the shoulder, and pulmonary nodule. (R. 383). X-rays of Howell's cervical and lumbar spine completed on that date were normal, and x-rays of his thoracic spine showed minimal scoliosis. (R. 453-55).

Howell saw Tommy D. Foreman, D.O., at the Miami Health Center on February 3, 2012 for an annual examination, and Howell said that he had been experiencing chest pains and getting relief from taking a friend's nitroglycerin. (R. 465-67). Assessments were hypertension, COPD, hyperlipidemia, osteoarthrosis of the shoulder, and psoriasis. (R. 467). Dr. Foreman referred Howell for cardiac tests. *Id.*

Howell saw Dr. Foreman on May 7, 2012 for a checkup of his blood pressure and his neck, back, and knee pain. (R. 514-16). Assessments were unchanged from the February 3, 2012 assessments. (R. 515).

Howell presented to the emergency room at Craig General Hospital on June 26, 2012 with chest pain. (R. 486-502). A chest x-ray showed mild congestive heart failure. (R. 498). Howell was discharged the same day. (R. 486-502).

Howell was seen by Dr. Foreman on August 13, 2012 and informed of the emergency room visits for chest pain. (R. 510-12). Howell complained that the hot weather made his breathing problems and his pain worse. (R. 510). On examination, scattered psoriatic plaques were noted on Howell's arms, legs, and trunk. (R. 511). Assessments were unchanged from the May 7, 2012 assessments. (R. 511-12).

An MRI of Howell's right knee completed on August 23, 2012 noted multiple findings, including severe degenerative tearing of the medial meniscus; severe chondromalacia; and a large suprapatellar joint effusion. (R. 503-04).

Howell saw Dr. Foreman on December 3, 2012, and he complained of pain in his right knee. (R. 506-08). Howell also said that his psoriasis had been getting worse. (R. 506). On examination, psoriatic plaques were noted on Howell's arms and legs. (R. 507). Assessments included hypertension; hyperlipidemia; COPD; psoriasis; and pain in the right knee. *Id.* A note

from the visit states that there was a six-month wait for an orthopedic referral. (R. 508). Another note stated laboratory test results, and Dr. Foreman stated that he would start Howell on metformin "to start control of his sugars." (R. 505).

Howell saw Carl Depaula, M.D., on December 13, 2012 regarding his right knee. (R. 520). Dr. Depaula noted the MRI results for Howell's right knee and said that weight-bearing x-rays showed a "significant narrowing of the medical compartment of the right knee." *Id.* On examination, Howell had "laxity of the medial joint to valgus stressing." *Id.* There was tenderness over the medial joint space, with mild-to-moderate effusion. *Id.* Dr. Depaula's assessment was arthralgia of the right knee, with a note to rule out internal derangement and/or degenerative changes. *Id.* Dr. Depaula was concerned that Howell's psoriasis would affect his acceptability for arthroscopic surgery, and he prescribed medication to treat Howell's skin in his knee area. *Id.*

Howell saw Dr. Depaula again on January 17, 2013, and Dr. Depaula's assessment was "[s]ymptomatic degenerative joint disease medial compartment, right knee." (R. 519). Dr. Depaula gave Howell's right knee a steroid injection, and he directed Howell to follow up with his primary care physician for his psoriasis in general and to continue treatment of the skin around the knee. *Id.* Dr. Depaula said that "[a]t some point in time he is going to need a right total knee replacement." *Id.*

Howell saw Dr. Foreman on April 8, 2013 for a four-month checkup, and it was noted that the injection from Dr. Depaula seemed to be helping Howell's knee. (R. 21-23). Assessments were hypertension; hyperlipidemia; pre-diabetes; osteoarthrosis of the shoulder; psoriasis; COPD; and elevated liver enzymes. (R. 22).

7

Howell saw Dr. Depaula on April 29, 2013, and Dr. Depaula said that Howell had received good relief from the injection. (R. 6). Dr. Depaula said that he believed Howell needed to see a dermatologist for his psoriasis and that a dermatologist might be able to prescribe a stronger medication. *Id.* He said that Howell would return in six months to possibly receive another injection. *Id.*

Nonexamining agency consultant Kenneth Wainner, M.D., completed a Physical Residual Functional Capacity Assessment on September 15, 2011. (R. 423-30). Dr. Wainner indicated that Howell could perform the entire range of work at the "medium" exertional level. (R. 424). In a space for narrative explanation, Dr. Wainner summarized the medical evidence regarding Howell's knee, lung nodule, shoulders, and back. (R. 424-25). Dr. Wainner summarized Howell's activities of daily living. *Id.* Dr. Wainner found no postural, manipulative, visual, communicative, or environmental limitations. (R. 425-27).

## Procedural History

The administrative transcript is not clear regarding Howell's application, but the ALJ stated in his decision that Howell had filed an application for disability insurance benefits with a protective filing date of July 27, 2011, and Howell's attorneys seem to agree that the only application at issue is this one. (R. 31); Plaintiff's Opening Brief, Dkt. #12, n.1. The application was denied initially and on reconsideration. (R. 99-106). An administrative hearing was held before ALJ Lantz McClain on March 4, 2013. (R. 69-90). At the hearing, Howell amended his alleged onset of disability date to June 26, 2012. (R. 72). By decision dated March 25, 2013, the ALJ found that Howell was not disabled. (R. 31-41). On August 6, 2014, the Appeals Council denied review. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981.

**Social Security Law and Standard Of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[1] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported

---

[1] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

### Decision of the Administrative Law Judge

In his decision, the ALJ found that Howell met insured status requirements through December 31, 2015. (R. 33). At Step One, the ALJ found that Howell had not engaged in any substantial gainful activity since his amended alleged onset date of June 26, 2012. *Id.* At Step Two, the ALJ found that Howell had severe impairments of degenerative joint disease of the right knee, status post injury in motorcycle accident; history of mild congestive heart failure; COPD in smoker; and obesity. *Id.* The ALJ noted that Howell had a history of psoriasis, but said that the record indicated that it was much improved with treatment. *Id.* The ALJ found that Howell's psoriasis and hypertension were nonsevere impairments. *Id.* At Step Three, the ALJ found that Howell's impairments did not meet any Listing. (R. 34).

The ALJ found that Howell had the RFC to perform a range of work at the "sedentary" exertional level and that Howell should avoid concentrated exposure to dust or fumes. (R. 34). At Step Four, the ALJ determined that Howell was unable to perform any past relevant work. (R. 39). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Howell could perform, taking into account his age, education, work experience, and

RFC.  *Id.*  Therefore, the ALJ found that Howell had not been disabled from June 26, 2012, through the date of his decision.  (R. 40).

### Review

Howell states his first argument as error at Step Two and Step Three.  Plaintiff's Opening Brief, Dkt. #12, p. 4.  This first argument is based on Howell's psoriasis and his right knee impairment.  *Id.*, pp. 5-7.  Howell's second argument is that the ALJ's credibility assessment was inadequate.  *Id.*, pp. 4, 8-9.  The undersigned agrees that the ALJ's evaluation of Howell's psoriasis was not supported by substantial evidence.  Because this aspect of the ALJ's decision indicates that he did not, as required, consider all of Howell's impairments in combination in assessing his limitations, the undersigned recommends that the Commissioner's decision be **REVERSED AND REMANDED**.

"It is beyond dispute that an ALJ is required to consider all of the claimant's medically determinable impairments, singly and in combination."  *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006).  In the present case, Howell testified that he had difficulty sitting and sleeping due to the psoriasis.  (R. 75, 81-82).  The psoriasis was very itchy, and it remained "bad" even though Howell used prescription creams and medications on it.  (R. 80).

The objective medical evidence is consistent in noting Howell's psoriasis and numerous "plaques" on his skin, beginning with office visits in November 2009 and continuing through Dr. Depaula's recommendation in April 2013 that Howell see a dermatologist to obtain stronger medication.  (R. 6, 21-23, 288-89, 342-43, 382-84, 465-67, 506-08, 510-12, 514-16, 520).  Medications were consistently prescribed for this condition.  *Id.*  On examination, multiple plaques were noted on at least three occasions.  (R. 382-84, 506-08, 510-12).  Perhaps the most significant medical finding was that of Dr. Depaula, who appears to be an orthopedic specialist.

To this reviewer, Dr. Depaula's notes indicate that he found Howell's psoriasis to be so severe that it would be a possible impediment to arthroscopic surgery. (R. 520).

Given Howell's testimony regarding the effects of his psoriasis and the objective medical evidence that appears to be consistent with Howell's testimony, the ALJ's finding at Step Two that Howell's psoriasis was nonsevere appears erroneous. An error at Step Two is harmless so long as the ALJ finds at least one condition to be severe, so that the five-step sequential evaluation continues. *Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007) (no error in ALJ's failure to include claimant's reflex sympathetic dystrophy as severe impairment at Step Two); *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (any error at Step Two was harmless when ALJ properly proceeded to next step of evaluation sequence). Therefore, because the ALJ found severe impairments at Step Two, there was no reversible error at this step.

The ALJ's error here was in apparently dismissing Howell's psoriasis as having no effect on Howell's ability to perform basic work activities. (R. 33). His dismissal of any effects from Howell's psoriasis was based on one reference, by Dr. Depaula, that Howell's skin looked "much improved" after one month of treatment with medication. (R. 33, 519). The undersigned finds that a reasonable interpretation of Dr. Depaula's note was that he was referring to improvement specifically in the area of Howell's right knee. (R. 519). The ALJ, using this one statement, extrapolated that Howell's psoriasis was "much improved with treatment." The undersigned finds this statement by the ALJ to be an unsupported and overly broad conclusion based one office visit.

The faultiness of the ALJ's conclusion that Howell's psoriasis was much improved with treatment is clearly shown by the next entry, an office visit on April 29, 2013, in Dr. Depaula's treatment of Howell. (R. 6). The ALJ did not have the record of this office visit before him when he made his decision, but this evidence was submitted by Howell to the Appeals Council. It is

therefore part of the record before this Court for purposes of deciding whether the ALJ's decision was supported by substantial evidence. *Martinez v. Barnhart*, 444 F.3d 1201, 1208 (10th Cir. 2006) (a reviewing court "must consider the entire record, including [the newly-submitted] treatment records, in conducting [its] review for substantial evidence on the issues presented").

In the notes from the April 29, 2013 office visit, Dr. Depaula stated that Howell had been using the prescription medication on his knee "to counteract the psoriasis." (R. 6). Dr. Depaula continued: "I think he needs to see a dermatologist; possibly be on a stronger medicine." *Id.* Thus, even though Howell's skin around his knee had looked "much improved" after one month's treatment, three months later Dr. Depaula continued to be concerned about the psoriasis, and he recommended consultation with a specialist. This evidence contradicts the ALJ's conclusion that Howell's psoriasis was nonsevere because it was much improved with treatment. The ALJ's finding was not supported by substantial evidence, and he therefore should have considered what limitations Howell had due to his severe impairment of psoriasis and due to the combination of all of Howell's impairments. His failure to include this analysis in his decision requires reversal.

Because reversal is required by the ALJ's faulty consideration of the evidence regarding Howell's psoriasis, the undersigned need not discuss the remaining arguments included in Plaintiff's Opening Brief. The undersigned, however, encourages the ALJ on remand to consider obtaining new evidence from agency consultants due to the longitudinal picture presented both by Howell's amended onset date and by the significance of the more recent medical evidence. While Howell amended his onset date to June 26, 2012, the only opinion evidence obtained by the agency was from nonexamining consultants in 2011. (R. 423-31). More recent opinion evidence could be of assistance to the ALJ on remand, and this is especially true given important evidence that was not available to the consultants in 2011. One of the 2011 consultants, Dr. Wainner, had

noted the results of x-rays of Howell's right knee, which were generally unremarkable. (R. 424-25). Dr. Wainner did not have available to him the results of the August 23, 2012 MRI that appeared to make significant findings of multiple problems with Howell's knee. (R. 503-04). Dr. Wainner also did not have the benefit of Dr. Depaula's 2013 opinion that Howell would eventually need a total knee replacement and his apparent concern regarding the effect of Howell's psoriasis on possible surgery. (R. 6, 519-20).

While the ALJ tempered Dr. Wainner's opinion that Howell could do "medium" work significantly in Howell's favor by limiting him to "sedentary" work based on Howell's problems with his knee, a medical opinion that looks at the combination of all of Howell's impairments might be of assistance on remand. *See Chapo v. Astrue*, 682 F.3d 1285, 1293 (10th Cir. 2012) (encouraging ALJ to obtain updated exam when opinion of agency examining consultant was "patently stale" in that the relevant medical record had "material changes" after consultant's opinion had been given). On remand, as the Tenth Circuit did in *Chapo*, the undersigned encourages the ALJ to obtain an updated examination and/or report "to forestall any potential problem arising in this respect on remand." *Id.*

## Conclusion

The undersigned recommends a finding that the Court takes no position on the merits of Howell's disability claim, and that "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case should be remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

The undersigned recommends reversal based on the ALJ's failure to adequately address the evidence of Howell's psoriasis throughout the five-step sequential process. The undersigned therefore has not addressed the other issues raised by Howell. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Howell.

**Objections**

In accordance with 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), a party may file specific written objections to this Report and Recommendation, but must do so by January 28, 2016. If specific written objections are timely filed, the District Judge assigned to this case will make a *de novo* determination in accordance with Rule 72(b). A party waives District Court review and appellate review by failing to file objections that are timely and sufficiently specific (the "firm waiver rule"). *Moore v. Astrue*, 491 Fed. Appx. 921, 923 (10th Cir. 2012) (unpublished), *citing In re Key Energy Res., Inc.*, 230 F.3d 1197, 1200-01 (10th Cir. 2000).

Dated this 14th day of January 2016.

_____
Paul J. Cleary
United States Magistrate Judge